**SIGNED THIS: October 27, 2025**


_____

**Peter W. Henderson**
**Chief United States Bankruptcy Judge**

_____


## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| In re: | |
| | |
| **DEANDRE LAMONT WHITE,** | |
| Debtor. | Case No. 25-80228 |
| | |
| **STEPHANIE RHODES, Plaintiff,** | Adv. No. 25-8008 |
| v. | |
| **DEANDRE LAMONT WHITE, Defendant.** | |


### OPINION

Stephanie Rhodes lent money to Deandre White, now a debtor in bankruptcy, while she was in a year-long romantic relationship with him. Though he promised to pay her back, he never intended to do so. Rhodes was justified in relying on his promises at first, given their relationship. As time went by, however, she could no longer justifiably rely on those empty promises. Under 11 U.S.C. §523(a)(2)(A),

therefore, a portion of the money White owed Rhodes is not subject to discharge in White's bankruptcy, and the remaining portion will be discharged.

## I.  Findings of fact

A trial in this adversary case took place on October 6, 2025. The Court makes the following findings of fact based on the evidence presented at trial.

### A.  The relationship

Stephanie Rhodes met Deandre White through a dating page on Facebook in early April or May 2023.[1] Their relationship progressed quickly; by May 19, White had convinced Rhodes to borrow $3,000 with him from a high-interest lender so that he could catch up on his past-due rent. Rhodes considered White a serious partner; White was not so committed. But White convinced Rhodes that their relationship was more than just a casual arrangement—they talked about getting married and adopting a child—and Rhodes acted in the hope and belief that was true.

Rhodes had had a double mastectomy with no breast reconstruction in 2020 and had since been unable to find someone interested in dating her, which she attributed to the surgery: "Whenever I would try to date and the man would find that out, that would be the end of it." Within the first few weeks of meeting Rhodes, though, White told her that he did not care and that he wanted to be with her. Their relationship lasted a year. Over that time, Rhodes lent a total of about $10,000 to White and outright gifted an additional $7,000. Rhodes's money played a not insignificant role in their relationship. In a message from April 16, 2024, for example, Rhodes promised to give White $50 if he would come meet her that night. Def. Exhs. 2, 5. What kept the relationship going, in part, was that White could provide love and intimacy, and Rhodes could provide money. Each was comfortable with those relationship dynamics at the time; the couple was able to joke about the coincidence of Rhodes's desires for affection and White's financial needs.[2] To Rhodes, this was the committed, sexual relationship that she had wanted but been unable to find since her mastectomy, and she

---

[1] Rhodes testified the relationship began in early May; she also testified they had been in a relationship for 45 days before they took out the $3,000 loan, which was incurred on May 19.

[2] To be clear, this was not a sex-for-money relationship, as White insinuated at trial. Rhodes was willing to help White out financially because she cared for him and wanted a long-term relationship with all that entails, including (but not limited to) sex.

was willing to make (what turned out to be) poor financial decisions because the relationship satisfied that want.

The relationship ended after Rhodes concluded that White was seeing other women. White admitted at trial that he had not been monogamous and characterized his relationship with Rhodes as just "messing around." That characterization was not communicated to Rhodes at the time, though (and the Court does not find it to be wholly truthful); White had told Rhodes that he loved her and wanted to marry her so they could be a family. Had she known that White was interested only in "messing around," Rhodes would not have welcomed him into her life as she did, including by introducing him to her son. Even after feeling betrayed, Rhodes was still willing to sacrifice her economic interests to have a chance to be in a relationship with White. Around the beginning of July 2024, Rhodes offered to forgive the entire $10,000 debt if White would give her the exclusive relationship she wanted. He wouldn't, so she didn't.

The Court received some testimony about events that occurred after the relationship ended. In particular, White feels that Rhodes defamed him by posting on Facebook about sexually transmitted diseases that he allegedly gave her. (He listed the defamation claim as a potential asset in his underlying bankruptcy case.) The Court concludes that the probative value of that evidence (as to Rhodes's motive or bias in testifying as she did in this trial) is minimal, if not non-existent. The Court places no weight on any evidence concerning the alleged defamation that occurred after the relationship was over, and it need not resolve any factual questions about the alleged diseases. The only potentially relevant evidence—which is uncontested—is that White was seeing other women while in a relationship with Rhodes.

**B.      The loans**

From Rhodes's point of view, she both gave and lent money to White. Rhodes began keeping track of the "loans" on a separate spreadsheet from her regular financial spreadsheet beginning in June or July of 2023. Pl. Exh. 1. Any "gifts" were not recorded on the loan spreadsheet. For each of the following items, the Court finds that White promised to repay Rhodes but never did. The Court further finds, based upon his pattern of borrowing and not repaying, that White never intended to repay the loans.

3

1.      Rhodes (as borrower) and White (as co-borrower) obtained a $3,100.41 loan from Heights Finance Corporation on May 19, 2023. The loan was secured by two televisions and a 2006 Chevrolet Suburban belonging to White. The purpose of the loan was to pay White's past-due rent, and he received all of the funds. White needed Rhodes to be the borrower, though, because Rhodes had a credit score of 717 and White had no credit score. Rhodes agreed to be the borrower because she wanted to help White build credit. The loan was to be repaid at $155 per month over 29 months, and White told Rhodes that he would make all of the payments. White authorized Heights Finance to withdraw $155 per month from his bank account through an automatic electronic funds transfer beginning in August 2023.

Rhodes made the first two payments, in June and July. She then lent White $155 so he could make the payment in August through the automatic EFT. In September, Rhodes made the $155 payment herself. She again lent $155 in October, but the October automatic EFT was rejected for insufficient funds (NSF). White told Rhodes that her first payment was used to pay for his truck insurance. So she lent him another $100 to replenish his bank account. The October payment did not come from White's bank account, however; Rhodes herself paid the $155 on October 30 using her credit card. Pl. Exh. 4, Doc. #28 at 25. In November, Rhodes again lent $155 to White, but his check again was rejected as NSF. This time White made the payment, on November 30, with his credit card. Rhodes again lent him $155 in December, and he used his credit card to pay that amount to Heights Finance on December 22.

Heights Finance did not receive its contractual January payment. From then on Rhodes made the payments herself, tendering $155 each month in February, March, and April from her bank account. By May, she was worried that the outstanding loan could jeopardize her employment with the Federal Bureau of Prisons, as a review of her finances was upcoming. So in May she paid off the balance of the loan with a $2,705.71 check drawn on her bank account.

In total, then, Rhodes loaned White $720 so that he could make monthly payments on the loan. White in fact used $465 of that money to make three monthly payments. Rhodes paid Heights Finance $3,790.71 directly.

While the loan was pending, White told Rhodes that he was working every day at Rivian, and that he would work overtime to make sure he could repay her by the end of the 2023. Rhodes now suspects that White did not work nearly as much as he said he

4

did, but she presented no evidence pinning down White's work history. White, for his part, testified that his work at Rivian was off and on due to medical issues. His testimony was vague, though, and the Court is left without the ability to determine when he was or was not working (and whether overtime was a possibility). One thing is clear: White never repaid Rhodes for any of the $4,510.71 she provided to apply towards the Heights Finance loan.

The Court finds that White never intended to repay the loan. White received all of the money. He did not make any payments based upon his own funds. He told Rhodes that he would make payments through his wages at Rivian. If he was working at Rivian, then his failure to apply that money to the loan reveals his intention not to repay them. If he was not working at Rivian, his lies to Rhodes about his work reveal his intent to deceive Rhodes, suggesting he never intended to repay the loan. In either case, the Court finds that White did not intend to repay Rhodes as he promised to induce her to co-sign the loan—a finding informed, in part, by White's pattern of non-payment established below.

2.      In June 2023, White asked Rhodes to buy him an Apple Watch from eBay and promised he would pay her back within a week. Rhodes bought the watch, and White did not repay her. When Rhodes asked White to either repay her or to return the watch, White refused and falsely told her the watch had been a gift.

3.      In the summer of 2023, White asked Rhodes for money on three separate occasions (June, July, and August) so that he could buy meat to grill at work potlucks. He told her that he would pay her back with contributions he would receive from his coworkers. She lent him a total of $200, which he never repaid. There is no evidence that the potlucks did or did not occur.

4.      In late-June / early July 2023, White told Rhodes that he needed money to pay for a lawyer in an ongoing child custody case. He promised to work overtime to pay her back almost immediately. She loaned him $1,200; he did not pay her back. White did not use the money to hire a lawyer; he represented himself in the custody case. When pressed to repay the $1,200, he falsely claimed that he had withdrawn $6,000 from his retirement account. In fact, he did not withdraw $6,000. Instead, he fabricated an email showing a $6,000 withdrawal and then claimed that the check had been stolen out of his mother's mailbox, and it was now a "criminal case." By Thanksgiving, White told her he had received the money, but he never repaid Rhodes.

5.      In July 2023, Rhodes lent $250 to White so that his co-worker could make him a grill out of barrels. The loan was never repaid.

6.      On four separate occasions, Rhodes lent White money so he could pay his phone bill and retain his service. Those loans occurred in July ($100), September ($100), March ($104.55), and April ($97.00). They were not repaid.

7.      In September 2023, Rhodes lent White $247.87 to change the rotors on his truck. He said he would pay her back as soon as he got paid. The loan was never repaid.

8.      In December 2023, Rhodes lent White $350 so he could pay his electric bill. The loan was never repaid.

9.      On several occasions in early 2024, Rhodes lent White money so he could pay his rent and bills. In November 2023, White told Rhodes that he had been fired from his job and was facing eviction because his son's mother had called both Rivian and the trailer park where he lived and told them he was selling drugs at both places. She believed that he was not working beginning around Thanksgiving.

 Rhodes lent $600 for rent in January. White falsely told her that he had been hired by Komatsu but then contracted Covid and was let go. In fact, White was never hired at Komatsu. White also told her that he got a job working maintenance at a trailer park. She lent him $40 in early February for gas money so he could attend job training in Champaign.

Later that month, White told Rhodes that he had been fired and was no longer working at the trailer park. She lent him $600 to help him pay bills in February. She lent another $600 in March because he said he was not working. In April, White told Rhodes that he had begun working at the trailer park again, but he would not receive his pay in time to pay the rent. Rhodes accordingly lent $600 for the rent. White again asked for additional money for gas to get to work, and Rhodes lent another $40. Rhodes promised to repay it promptly. When he did not pay, Rhodes later demanded the money: "Can you at least send the gas money back if you're not coming over tomorrow night?" Pl. Exh. C-2.

10.     On multiple occasions in early 2024, Rhodes lent White money to pay dental bills. White had to have a tooth pulled; that led to an infection; and he did not have the money to pay the dentist. The total amount—$430—was not repaid.

11.     In April 2024, Rhodes lent White $73.67 to pay for his truck insurance. The loan was not repaid.

12.     In April 2024, Rhodes lent White $100 so he could buy medication. The loan was not repaid.

13.     In May 2024, Rhodes had given White a $50 Walmart gift card. White told her he wanted to buy groceries from Kroger instead. White promised to return the $50 gift card in exchange for $50 in cash. After Rhodes agreed and sent $50, White did not return the gift card. He instead falsely claimed that his wallet had been stolen.

## II.     Procedural matters

White filed a Chapter 7 bankruptcy petition in March 2025 and received a discharge four months later. Rhodes filed this adversary case at the end of May. The complaint consists of one count, and it alleges that Rhodes's debt, in the amount of $10,288.09, was obtained by fraud, 11 U.S.C. §523(a)(2). Rhodes seeks both a determination of non-dischargeability and a money judgment. This Court has jurisdiction under 28 U.S.C. §157(a) and ILCD LR 40.2(A). This is a core matter under 28 U.S.C. §157(b)(2)(I). The parties have consented to the Court's adjudication of this matter and the entry of a money judgment on the non-dischargeable debt. See *Wellness Intern. Network, Ltd. v. Sharif*, 575 U.S. 665 (2015).

The complaint relies upon White's known false statements—for example, his request for $1,200 to hire a lawyer he did not hire—to establish a "continuing course of deceitful and deceptive conduct intended to induce [Rhodes] to loan him [money] … which he had no intention of repaying." Rhodes alleges she reasonably relied on White's representations in continuing to loan him money, and that his promises to pay were fraudulent in their inception and made in bad faith.

White has represented himself in the adversary case, while Rhodes is represented by counsel. The Court has construed White's objections and arguments liberally, but it is not the Court's role to serve as his advocate. So while the manner of Rhodes's

testimony and many of her exhibits at trial were objectionable, see *Collins v. Kibort*, 143 F.3d 331, 338 (7th Cir. 1998); Fed. Rs. Evid. 611(c), 803(5), 803(6), the Court did not interpose its own objections. The sense the Court had, and still has, is that White does not contest the existence of the loans, even if he professes not to remember all of them. His defense, instead, is that the loans were made in the context of a bona fide relationship, in which he treated Rhodes well, and that the loans were forgiven after the relationship was over. White had pretrial notice of the exhibits and the ability to cross-examine Rhodes, and any evidentiary defects could have been easily cured upon a pretrial motion or a timely objection. See *Cehovic-Dixneuf v. Wong*, 895 F.3d 927, 932 (7th Cir. 2018). It would not have been appropriate for the Court *sua sponte* to insist on evidentiary precision as to matters that were uncontested.

## III.   Conclusions of law

An eligible Chapter 7 debtor is entitled to a discharge of all debts that arose before the date of the bankruptcy petition "[e]xcept as provided in section 523" of the Bankruptcy Code. 11 U.S.C. §727(b). Section 523(a)(2)(A)'s exception prevents a court from discharging "any debt … for money … to the extent obtained by … a false representation, or actual fraud…." Money is obtained by a false representation when (1) the debtor made a statement either knowing it to be false or with reckless disregard for the truth; (2) in making this misrepresentation the debtor intended to deceive; and (3) the creditor actually and justifiably relied upon the misrepresentation. *Field v. Mans*, 516 U.S. 59, 73–76 (1995); *Matter of Scarlata*, 979 F.2d 521, 525 (7th Cir. 1992). Money is obtained by "actual fraud," meanwhile, when someone obtains the money with wrongful intent through fraud. *Bartenwerfer v. Buckley*, 598 U.S. 69, 76 (2023); *Husky Intern. Electronics, Inc. v. Ritz*, 578 U.S. 355, 360 (2016). Fraud requires neither a false representation nor reliance, and it includes any unfair way by which another party is cheated, such as surprise or trickery. *Chicago Patrolmen's Fed. Credit Union v. Fenner (In re Fenner)*, 558 B.R. 877, 885 (Bankr. N.D. Ill. 2016). The creditor bears the burden of proving an exception to discharge. *Grogan v. Garner*, 498 U.S. 279, 291 (1991).

As an initial matter, the Court finds that Rhodes considered all of the loans described above to be loans, not gifts. Rhodes credibly testified that each of the described loans came at White's request and upon his promise to repay them. No contrary evidence was received. Each of the loans is a debt owed to Rhodes. See 11 U.S.C. §101(12); *id*. §101(5)(A). The question is whether each loan was obtained by a false representation or actual fraud.

8

### A.      The evidence does not support a finding of actual fraud.

Rhodes first argues that she is the victim of actual fraud in that White deceived
her by telling her he loved her and wanted to marry her. Rhodes did not produce
sufficient evidence, however, that White fraudulently induced her into believing that
their relationship would result in marriage. The Court has no doubt that Rhodes hoped
that was the case; had she not believed a future with White was possible, she would not
have gifted and loaned him money. Most failed relationships, though, involve fumbling
through a mismatch of expectations and wishes. Both White and Rhodes stayed in this
relationship for as long as they did because it was giving them something, if not
everything. Both sought and enjoyed an intimate relationship. They socialized with
each other's children and enjoyed each other's company.

White characterized their relationship at trial as just "messing around," even
though he convinced Rhodes at the time that it was more serious, which suggests he
was intentionally deceiving her. White's testimony overall, though, was not credible,
and the Court finds that the "messing around" testimony was less than truthful as well.
The picture the evidence paints is of a couple who found in each other what they
wanted for themselves and who ignored (or tried to wish away) the part they did not.
Rhodes has not provided sufficient evidence to prove that White had a wrongful intent
in entering into and remaining in the relationship such that their relationship could be
called a fraud.

There are, no doubt, situations in which relationships are built on fraud. So-
called "romance scams" easily qualify; the typical case involves a fictitious online
persona that is used to begin a romantic relationship with a user on a dating site in
order to extract payments from the victim. E.g., *United States v. Abbas*, 100 F.4th 267,
275–76 (1st Cir. 2024). But this is not a romance scam; there is no evidence that White
sought Rhodes out on Facebook in order to extract money from her, and there is ample
evidence that this was a bona fide relationship, if not the exact relationship Rhodes was
looking for. Closer to this matter are cases in which an empty promise to marry is made
to induce the victim into handing over money. That can constitute fraud. *Thomas v.
Turner (Matter of Turner)*, 12 B.R. 497, 500–01 (Bankr. N.D. Ga. 1981). But again, Rhodes
did not establish that it was more likely than not that White (1) actually promised to
marry Rhodes, or (2) that his statements about the relationship were made with the
intent to obtain money. In other words, there is no causal or precise link between

Rhodes's general testimony about White's professed affections and her decision to lend money. She certainly believed a future with White was possible, and she would not have lent the money but for that belief, but it is on White's intent, not Rhodes's hopes, that actual fraud focuses. Compare with *Farina v. Balzano (In re Balzano)*, 127 B.R. 524, 530 (Bankr. E.D.N.Y. 1991). On this record, the Court does not find it more likely than not that White acted with the intent to defraud Rhodes by falsely promising her love and marriage.

Findings of fraud depend upon the facts of a particular case, and the Court is mindful that "actual fraud" under §523(a)(2)(A) can be broadly applied to mean "any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another." *McClellan v. Contrell*, 217 F.3d 890, 893 (7th Cir. 2000). White was an unfaithful partner, and Rhodes justifiably felt betrayed when she learned that he was seeing other women. It is not outside the realm of possibility that White perpetuated a lie and remained in the relationship to "gain an advantage over [Rhodes] by false suggestions or by the suppression of truth." See *id*. But the Court declines to draw that inference on this record based upon the evidence presented at trial. The Court finds that Rhodes and White each had incentives to remain in the relationship, and that Rhodes has not proven that White stayed in the relationship under false pretenses with the intent to take her money.

**B.    White obtained certain loans through material misrepresentations upon which Rhodes justifiably relied.**

Rhodes's stronger argument, and the one she emphasizes in her complaint, is that White obtained property from Rhodes by false representations. Rhodes has proven that White had no intention of repaying any of the loans when they were made. The Court draws that inference based upon White's pattern of requesting payment, sometimes through other lies, and then never repaying.

Take first the most obvious misrepresentation. White lied about intending to hire a lawyer and then lied about withdrawing money from a retirement account to pay Rhodes back. The $1,200 loan from the summer of 2023 was made based upon the former misrepresentation; White intended to deceive Rhodes; and Rhodes actually and justifiably relied upon the misrepresentation in loaning $1,200. That $1,200 will not be discharged because it is a debt for money obtained by a false representation.

White also lied to Rhodes about the Apple Watch. Rhodes's testimony was credible that White had promised to repay her for the watch once he got paid within a week's time. He later lied to her that the watch had been a gift. The natural inference from White's lie is that he never intended to repay her for the watch, and that is the inference the Court draws. A promise to pay made with the present intention not to pay is a cognizable misrepresentation under §523(a)(2)(A). *Bednarsz v. Brzakala (In re Brzakala)*, 305 B.R. 705, 711 (Bankr. N.D. Ill. 2004). Rhodes had no reason to doubt White's promise to repay; the $150 she spent for the Apple Watch was a debt obtained by a false representation that will not be excepted from discharge.

Rhodes did not prove any other material falsehoods, however, apart from White's promises to repay the loans. The trial contained insinuations, but not proof, that White was not truthful about his employment status. The one other falsehood Rhodes did highlight—White's purported employment status at Komatsu—is immaterial; whether White was terminated shortly after being hired or whether he was not hired in the first place is insignificant. In both cases, Rhodes knew that White was not employed by Komatsu when making loans in early 2024. The Court generally does not know the details of White's employment, which details he shared with Rhodes, and whether those shared details were truthful. Other potential falsehoods went unproven as well. The Court does not know if the summer 2023 potlucks actually occurred, or if White just pocketed the money; the Court does not know if a co-worker actually made a grill out of barrels; the Court does not know if White needed gas money to travel to Champaign; the Court does not know if White actually needed medication. It seems likely, based on the presentation of evidence, that White was unemployed for a period of time; that he was behind on his rent; and that he did need money to pay his bills, including for his truck, dentist, electricity, and telephone service. So the only falsehood that the Court infers as to the other loans is that White never intended to pay Rhodes back even though he promised to do so.

Fraud based upon a misrepresentation requires actual and justifiable reliance on the misrepresentation. *Field*, 516 U.S. at 70. "Justifiable" reliance is a more relaxed standard than "reasonable" reliance, but it is a standard. *Field*, 516 U.S. at 70. A person is "required to use his senses[] and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." *Id*. at 71. A person who "has discovered something which should serve as a warning that he is being deceived" does not act in justifiable reliance on a misrepresentation without further investigation.

11

*Id*. Or to put it another way, the potential victim of a fraud may not behave recklessly by ignoring manifest danger. *AMPAT/Midwest, Inc. v. Illinois Tool Works, Inc.*, 896 F.2d 1035, 1042 (7th Cir. 1990); see also *BPI Energy Holdings, Inc. v. IEC (Montgomery), LLC*, 664 F.3d 131, 139 (7th Cir. 2011). "A creditor cannot ignore red flags, *i.e.*, facts that would call a debtor's representation into question." *First Merchants Bank v. Johnson (In re Johnson)*, 662 B.R. 635, 660 (Bankr. S.D. Ohio 2024).

Evidence of a close personal relationship weighs heavily in favor of finding at least justifiable reliance. *Lance v. Tillman (In re Tillman)*, 197 B.R. 165, 171 (Bankr. D.D.C. 1996) ("The courts reason that creditors are not to be faulted for relying on the honesty of close friends who take advantage of them."). That is consonant with the more general principle that a creditor's history of dealing with the debtor may (or may not) justify the creditor's reliance on the debtor's representations. *Johnson*, 662 B.R. at 661. Above all, the Court looks at the circumstances of the particular case and the characteristics of the particular plaintiff to determine whether the plaintiff justifiably relied on any particular misrepresentation. *Johnston v. Campbell (In re Campbell)*, 372 B.R. 886, 892 (Bankr. C.D. Ill. 2007) (GORMAN, J.).

Rhodes justifiably relied on White's promises to pay early on in their relationship. Though the evidence is thin, it is apparent that their relationship was close enough by May 19, 2023, that Rhodes was comfortable co-signing a $3,000 loan to cover White's past-due rent. Rhodes had no reason to believe that White would not pay her back; White had a job, was in fact behind on his rent, and was apparently committed to the relationship. Rhodes incurred the liability on the loan in justifiable reliance on White's promise to pay her back, which was a material falsehood. The misrepresentation caused $4,510.71 in damages, which will be excepted from discharge. Cf. *Kiester v. Everman (Matter of Everman)*, 72 B.R. 687, 690–91 (Bankr. M.D. Fla. 1987).

Rhodes justifiably relied on White's promise to pay her back for the Apple Watch as well. She justifiably believed that he was working and would pay her back once he got paid; nothing required her to question his promise to pay. That debt is for money obtained by a false representation, so it will be excepted from discharge. But it also represents the first "red flag" that White's promises to repay might not be reliable.

Rhodes again justifiably relied on White's promise to pay her back for the potluck in June 2023. She could rely on his representation that his coworkers would pay him back and he would return the funds to Rhodes. Given their relationship, she was

not required to question that premise to justifiably rely on it. The $65 lent in June will be excepted from discharge. But again, White's failure to repay $65 from money he presumably would have collected immediately from his co-workers raised another red flag for Rhodes.

Rhodes was aware of the mounting red flags. That is why, after the first few loans, she began a spreadsheet detailing how much money she had lent White.

The next loan was the $1,200 loan for White to obtain an attorney. Given their relationship, and the apparent sincerity of White's request, Rhodes justifiably relied on the many misrepresentations leading to that loan, so it will be excepted from discharge.

No evidence was presented on the circumstances surrounding the $250 loan for a grill made out of barrels in July 2023, apart from White's promise to pay that he did not keep. At this point, whether Rhodes justifiably relied on White's promise is a closer call. She had already lent White $1,415 (and had cosigned on a $3,000 loan, for which she had already made two $155 payments herself) and none of it had been repaid. Still, only a month had passed without repayment, so the Court will not fault Rhodes for her reliance on his promise to pay her back in July; the $250 will be excepted from discharge. But his failure to repay her on this loan was yet another red flag.

Rhodes lent White another $235 through the rest of the summer for his phone bill and food for two potlucks. She was not repaid. Because of their relationship, the Court finds that Rhodes justifiably relied upon White's promises to pay, so the $235 will be excepted from discharge. The same goes for the $100 and $247.87 Rhodes lent for White's phone bill and truck rotors in September and the $255 she lent for White to cover his Heights Finance loan payments in October. Those amounts will be excepted from discharge.

When White did not repay, though, and Rhodes recorded the unpaid loans on her spreadsheet, the number of red flags became too high to ignore. In addition to the months of unpaid loans, Rhodes learned by November that White's $1,200 lawyer-fee request (to be paid out of a purported $6,000 retirement withdrawal) had been a sham. The purported $6,000 check that had been "stolen" was "recovered" by November, and yet still White did not make good on any of his repayment promises. (To be clear: the $6,000 check never existed.) Most of the debts to this point should have been paid almost immediately; the potluck debts, for example, should have been paid from

13

contributions from co-workers, which would have been collected at the same time as the potlucks. In most cases, White told Rhodes he would pay her back when he got paid the next Friday. But by November 2023, a half-year's worth of debt had gone unpaid. Rhodes was not justified under the law to bury her head in the sand and continue to loan money in reliance on the promises of someone who had proven to be unreliable. See *Selvan v. Selvarajah (In re Selvarajah)*, No. 1:21-1057, 2025 WL 977605, at *14 (Bankr. E.D.N.Y. Mar. 31, 2025) (discharging debt when, after series of broken promises, creditor was "not justified in ignoring what she already knew—which was that the Defendant could not be trusted to repay her); *Cooperstein v. Williams (In re Williams)*, No. 23-2102, 2024 WL 5036453, at *5 (Bankr. D. Utah Dec. 6, 2024) (finding any reliance not justified given previous unpaid loans between romantic partners).

Thus, without additional evidence creating a justification for Rhodes to believe White's promise to pay, she did not justifiably rely on White's misrepresentations that he would repay her for the remaining loans. So why did Rhodes continue to lend White money after it had become obvious that he was never going to repay her? Because the money was less important to Rhodes than the relationship. Rhodes had been seeking an intimate relationship for years and felt unwanted. She found in White someone who seemed to want her. Even after they fell out—after it became apparent that White had been seeing other women—Rhodes was willing to forgive the debt if he would commit to an exclusive relationship with her. Rhodes did not justifiably rely upon misrepresentations about future payments or their future relationship when dealing with White; she hoped that White would commit to her and used her money to try to secure that commitment. The evidence showing that Rhodes did not justifiably rely on White's promises to pay tends to show that she did not actually rely on those promises, either; the material point was she wanted the relationship to continue.

Rhodes therefore did not justifiably rely on White's empty promises to re-pay her for the following loans:

- Electric bill in December 2023, $350
- Rent / bills payment in January 2024, $600
- Gas money in February 2024, $40
- Dentist bills in February 2024, $220
- Rent / bills payment in February 2024, $600
- Rent / bills payment in March 2024, $600
- Phone bill in March 2024, $104.55

- Truck insurance in April 2024, $73.67
- Phone bill in April 2024, $97
- Rent / bills payment in April 2024, $600
- Medication in April 2024, $100
- Gas money in April 2024, $40
- Dentist bills in May 2024, $210

The money White obtained from those loans are not subject to §523(a)(2)(A). Those debts are discharged.

Rhodes did justifiably rely on one last promise White made. White promised to return the $50 Walmart gift card in exchange for $50 in cash. Although Rhodes knew that White could not be trusted to repay a loan, she was justified (given their relationship) in trusting him to simply return the Walmart gift card. The $50 Rhodes paid for the return of the gift card will not be excepted from discharge.

In total, then, White is liable to repay $6,808.58 based upon money he obtained by false representations upon which Rhodes justifiably and actually relied:

| Debt | Amount |
|---|---|
| Heights Finance Loan | $4,510.71 |
| Apple Watch | $150.00 |
| Potlucks | $200.00 |
| Lawyer | $1,200.00 |
| Barrel grill | $250.00 |
| Phone bills – July and Sept. 2023 | $200.00 |
| Truck rotors | $247.87 |
| Walmart gift card | $50.00 |
| **Total** | **$6,808.58** |

## IV.    Conclusion

The aggregate debt of $6,808.58 will be excepted from discharge. 11 U.S.C. §523(a)(2)(A). The remaining pre-petition debt White owed Rhodes is discharged.

Rhodes requests pre-judgment interest in the amount of 5% starting on June 19, 2024, under 815 ILCS 205/2. White has not responded to that request. It may be that the

15

question of pre-judgment interest depends upon federal, not state, law, but the federal rate—which presumptively starts with the average of the prime rate during the time period in question, *Cement Division, Nat'l Gypsum Co. v. City of Milwaukee*, 31 F.3d 581, 587 (7th Cir. 1994)—would be higher. (The prime rate during 2024 and 2025 was at least 7.25%.) The Court will therefore award the lower state rate, because that is all Rhodes requests. The debt is for a fixed sum of money eligible for pre-judgment interest under state law. See *Harris v. Cassel (In re Cassel)*, 322 B.R. 363, 377 (Bankr. C.D. Ill. 2005) (PERKINS, J.). As a matter of the Court's discretion, it finds that pre-judgment interest is justified here to compensate Rhodes based upon the time value of money. Rhodes will be awarded pre-judgment interest from June 19, 2024, through October 27, 2025, for a total of $461.68. Post-judgment interest shall be governed by 28 U.S.C. §1961.

Finally, Rhodes in her complaint requested attorney fees, but nothing justifying a departure from the "American rule" has been presented to the Court. The request for attorney fees is denied. See *Cassel*, 322 B.R. at 377. Rhodes is entitled to costs as the prevailing party. Fed. R. Bankr. P. 7054(b)(1). Plaintiff shall file a bill of costs within 14 days of the date of this opinion. Defendant shall file any response or objection to Plaintiff's bill of costs within seven days of the date of filing of the bill of costs.

A separate judgment conforming to this opinion shall issue. Fed. R. Bankr. P. 7058.

# # #

16